# UNITED STATES DISTRICT COURT
for the
Middle District of North Carolina

| | | |
|---|---|---|
| United States of America<br>v.<br>Mahmoud Mazen ABU-DAMES | ) ) ) ) ) ) ) | Case No.<br>1:23MJ409-1 |
| _Defendant(s)_ | | |

**FILED**
in the Middle District of North Carolina
**September 28, 2023
9:25 am**
Clerk, US District Court
By: _____kg_____

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __September 20, 2023__ in the county of __Guilford__ in the __Middle__ District of __North Carolina__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. 922(a)(1)(a) | Dealing and Manfacturing Firearms without a License |
| Title 18 U.S.C. 922(o) | Unlawful Possession of a Machinegun |

This criminal complaint is based on these facts:
See Affidavit

☑ Continued on the attached sheet.

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Criminal Complaint and attached affidavit in accordance with the requirements of Fed. R. Crim. P. 4.1.

/s/ Michael Newsome
_Complainant's signature_

ATF Special Agent Michael Newsome
_Printed name and title_

Date: 09/28/2023    8:28 am

_Judge's signature_

City and state: Durham, North Carolina

Joe L. Webster, United States Magistrate Judge
_Printed name and title_

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF NORTH CAROLINA

## Probable Cause Affidavit

I, Michael B. Newsome, being first duly sworn, hereby depose and state as follows:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been since May 2017. I am currently assigned to the Charlotte Field Division, Greensboro I Field Office. I am a graduate of the Federal Law Enforcement Training Center ("FLETC") Criminal Investigator Training Program, as well as the ATF National Academy, where I received extensive training in the investigation of firearms, controlled substances, arson, and explosives offenses. Prior to my career with ATF, I worked for the Rocky Mount Police Department in North Carolina for approximately nine and a half years. During my tenure with the Rocky Mount Police Department, I served as a duly sworn Task Force Officer with ATF from 2014 – 2017. I am a graduate of North Carolina State University, as of 2007, with a Bachelor of Arts Degree in Criminology.

2. During my career in law enforcement, I have conducted and participated in numerous complex case investigations involving federal and state firearms and controlled substance violations. In furtherance of these investigations, I have utilized multiple investigative techniques including but not limited to physical and electronic surveillance, controlled purchases of evidence, management of confidential informants, forensic examination of electronic devices, and the seizure of electronically stored communications. I have experience monitoring and gathering information received from court ordered interception of wire and electronic communication, pen register and/or trap and trace device, real time GPS and geo-location information, historical call detail records, and vehicle GPS monitoring. Through this experience,

1

I have been able to successfully gather criminal intelligence and utilize this information in furtherance of ongoing criminal investigations.

3. Based upon my training and experience, I am familiar with Federal Criminal Codes and know that it is a violation of:

*Title 18 USC, Section 922(a)(1)(a)*, for any person except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce.

*Title 18 USC , Section 922(o)(1)*, it shall be unlawful for any person to transfer or possess a machinegun

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

PROBABLE CAUSE

Case Initiation

5. In August of 2022, the ATF Greensboro Field office was contacted by an undercover ATF agent from the Phoenix Field Division, hereinafter referred to as "UC-1", who wished to provide information on a suspected firearms trafficker from Greensboro, North Carolina (NC). UC-1 identified this suspected trafficker as Mahmoud Mazen ABU-DAMES and stated that he was believed to reside at 3405 Trail Ridge Dr., Greensboro, NC. UC-1 indicated that ABU-

2

DAMES was suspected of trafficking privately made firearms (PMFs) and machinegun conversion devices (MCDs) through utilization of the Telegram[1] online messaging application.

6. UC-1 advised that while conducting undercover activities on Telegram, they were invited into a chat group titled "MOE40CAL Gun Chat". The description for this group read as follows: *"Everyone in this chat has been verified! Pig free zone so you can post / talk about whatever you'd like without having to worry ab a Fed being in this chat."* The username of the administrator for this group was identified as "Mooster HULKSMASHULKS".

7. UC-1 utilized ATF's Internet Investigation Center (IIC) to see what intelligence could be provided on the group and its administrator. The IIC was able to locate additional online accounts on Youtube and Tiktok utilizing the MOE40CAL moniker. A review of the Youtube channel associated with the MOE40CAL profile name revealed numerous videos displaying completed firearms as well as PMFs in various stages of completion. The IIC also noted that the first video on the Youtube channel featured a male of Middle Eastern decent who appeared to be in his 20's giving instructions on how to make modifications to an E-cigarette.

8. While reviewing videos on the MOE40CAL Tiktok account, the IIC located a video which showed what appeared to be a BMW sedan displaying NC registration plate ELA-5060. This license plate was queried through the NC Department of Motor Vehicles which revealed it was registered to Mazen Abu-Dames (DOB 03/05/1967), who resides at 3405 Trail Ridge Dr., Greensboro, NC. The IIC then queried this address through law enforcement intelligence databases and was able to associate the address with Mahmoud Mazen ABU-DAMES (DOB 09/12/1999), who appears to be the son of Mazen Abu-Dames. The IIC also reviewed photographs

---

[1] According to the Telegram website, it is self-described as a heavily encrypted, cloud based online messaging application which can be accessed from a mobile device or desktop.

3

of Mahmoud ABU-DAMES in these databases and determined that he appears to be the same individual depicted in the MOE40CAL YouTube video.

9. Following this identification, UC-1 began communicating with ABU-DAMES aka "Mooster HULKSMASHULKS" on Telegram. UC-1 advised that ABU-DAMES openly advertised firearms and machinegun conversion devices for sale on this channel. During their communications, ABU-DAMES asked UC-1 if he was interested in purchasing drop-in auto sears to convert an AR-15 into a fully automatic machinegun. ABU-DAMES ensured UC-1 that he was not a scammer and encouraged UC-1 to place an order with him. ABU-DAMES even offered to sell UC-1 the machinegun conversion devices at a discounted rate if he purchased them in bulk.

10. Additionally, ABU-DAMES sent UC-1 photographs and videos of the items he had for sale. In one video, ABU-DAMES shows UC-1 numerous boxes which appeared to contain unfinished frames waiting to be manufactured. ABU-DAMES also showed UC-1 parts and accessories he utilizes to manufacture the PMFs, along with a what appears to be a 3-D printed drop-in auto sear. The photographs and video from ABU-DAMES appear to be an effort to establish himself as an actual firearm trafficker and not a scammer.

11. UC-1 negotiated prices with ABU-DAMES in preparation to place an order for drop-in auto sears. ABU-DAMES indicated that he would accept electronic transfer of payment through the Cashapp application and identified his account as "$yellochello / abbey". ABU-DAMES stated that he would mail the items to UC-1 after receiving payment.

12. After receiving this information from UC-1, I responded to 3405 Trail Ridge Dr., Greensboro, NC in an attempt to verify that ABU-DAMES still resided at that location. I located a 2013 Kia Optima parked in front of the residence bearing NC registration plate EDX-7576. A

4

query of this registration confirmed that it was registered to Mahmoud ABU-DAMES at this residence.

13. Throughout the month of August 2022, UC-1 continued to have undercover communications with ABU-DAMES on Telegram regarding the purchase of machinegun conversion devices. However, a controlled purchase was not attempted at this time until further investigative steps could be taken to corroborate that ABU-DAMES was, in fact, trafficking PMFs and machinegun conversion.

Review of Ebay Records

14. In May of 2023, I was able to review records provided by Ebay regarding suspicious transactions involving ABU-DAMES on their website. Upon reviewing these records, I learned that Ebay had flagged an account belonging to ABU-DAMES for selling items such as firearms parts and accessories which were believed to be illegal to sell under the National Firearms Act (NFA) and Gun Control Act (GCA). Closer examination of these records indicated that the referenced transactions occurred in June of 2022. I noted at least five (5) transactions during this time period in which ABU-DAMES sold items to other Ebay users across the country which he advertised as potentially prohibited items. The item descriptions for these listings are detailed below:

- *"auto sear / Auto Switch AR15 DIAS / DISPLAY ONLY"*
- *"auto sear / Auto Switch AR15 DIAS LEGAL"*
- *"AR15 lower / P80 / DIAS"*
- *"AR15 lower / P80"*
- *"AR15 lower receiver / P80"*

15. Based upon my training and experience, I know that "DIAS" is an acronym commonly used to describe a drop in auto sear. I also know that "P80" is an acronym commonly

5

used to describe Polymer80, which is a company who produces 80% polymer frames that individuals can purchase in order to manufacture PMFs.

16.     It should be noted that Ebay terminated ABU-DAMES account following discovery of these listings.

<u>Undercover Purchases of Evidence</u>

17.     In August of 2023, I began monitoring ABU-DAMES' activity on Telegram once again. While following ABU-DAMES' MOE40CAL Gun Chat channel, I observed that he frequently advertised PMFs and machinegun conversion devices for sale. I identified the below photograph which was posted by ABU-DAMES aka "Mooster" on July 22, 2023, that depicts items I recognize from my training and experience as 3-D printed drop-in auto sears, as well as,

6

Case 1:23-cr-00350-LCB    Document 1    Filed 09/28/23    Page 7 of 18

Glock conversion devices commonly referred to as "switches" which are used to convert Glock pistols into fully automatic machineguns:



18. On August 23, 2023, an agent from the ATF Greensboro Field Office acting in an undercover capacity, hereinafter referred to as "UC-2", began communicating with ABU-DAMES on Telegram. UC-2 sent ABU-DAMES a direct message on Telegram to introduce himself as an individual that wanted to begin purchasing items from him. ABU-DAMES boasted about the efficiency of his business and how he took care of his customers. ABU-

7

DAMES also asked UC-2 if he was interested in purchasing anything in particular and how much money he wanted to spend.

19. UC-2 informed ABU-DAMES that he preferred to purchase drop-in auto sears and Glock conversion devices. UC-2 also told ABU-DAMES that he worked on a construction crew with multiple Hispanics who he sold these machinegun conversion devices and firearms to. Additionally, UC-2 inferred that these items were then being trafficked across the border to Mexico.

20. Through additional communications, UC-2 informed ABU-DAMES that he would like to spend around $300.00-$400.00 for the first order. ABU-DAMES agreed to sell UC-2 approximately 4-5 drop-in auto sears and one Glock conversion device for $400.00. ABU-DAMES advised that he would accept electronic transfer of payment through Cashapp and identified his account as "$themoosterog". It should be noted that prior records obtained through a Grand Jury subpoena confirmed that this Cashapp account was registered to ABU-DAMES at 3405 Trail Ridge Dr., Greensboro, NC.

21. On August 26, 2023, UC-2 electronically transferred $400.00 to ABU-DAMES' Cashapp utilizing an undercover account. Prior to sending the payment, UC-2 provided ABU-DAMES with an undercover post office box address located in Greensboro, NC and requested that the package be sent to this location.

22. After learning that UC-2 lived in Greensboro, NC, ABU-DAMES requested that they meet in person to conduct the transaction. UC-2 asked that ABU-DAMES place the first order in the mail to ensure that the transaction went smoothy before meeting each other in person. ABU-DAMES insisted that he preferred to save on the shipping costs and suggested that

he could leave the package in a discreet location where it could be retrieved by UC-2 or one of his associates.

23. On September 1, 2023, ABU-DAMES indicated that he was going to leave the package on a walking trail located off of Old Battleground Rd. near Rody's Tavern in Greensboro, NC. UC-2 was familiar with this location and knew it to be the Palmetto Trail, which is also a short distance away from ABU-DAMES' residence. ABU-DAMES indicated that he would send UC-2 a video detailing the exact location of the package so that it could

easily be retrieved. ABU-DAMES provided the following photograph depicting the contents of the package he would be leaving:



24. It should be noted that ABU-DAMES also offered to include four (4) dosage units of Xanax in this package and encouraged UC-2 to find a market for them. ABU-DAMES indicated that the Xanax were extremely potent and would be profitable for UC-2 to sell.

25. Shortly after sending the above photograph, ABU-DAMES sent UC-2 a video detailing the exact location he hid the package on the walking trail. ABU-DAMES wrapped the machinegun conversion devices and Xanax in a bright pink bubble wrap package and then hid it underneath some leaves just off the trail. ABU-DAMES also draped a piece of flagging tape on a limb to mark the package's location.

26. After receiving the video, UC-2 coordinated with members of the Greensboro Police Department's Violent Crime Reduction Team to have the package covertly retrieved. An officer on this team utilized ABU-DAMES's video to recover the package in the location as

10

provided. The package was successfully recovered and was found to contain the contents exactly as they were described by ABU-DAMES: four (4) drop-in auto sears, one (1) Glock conversion device, and four (4) dosage units of suspected Xanax. It should be noted that the package also contained a sticker which depicted ABU-DAMES' personal logo, a fancy "M" which is short for his alias of "Mooster". All of these items were transferred to the custody of the ATF and submitted into evidence.

27. After successful delivery of the first package from ABU-DAMES, UC-2 informed him that he would like to meet in person for the second transaction. ABU-DAMES also agreed to meet in person for this transaction and provided UC-2 with the following cell phone number to facilitate future communications: 336-496-0135.

28. UC-2 inquired about purchasing completed firearms for this transaction. During their negotiations, ABU-DAMES offered to sell UC-2 two (2) AR-15 pistol variants, along with two (2) drop-in auto sears to convert them to fully automatic machine guns, and one (1) Glock conversion device for $2,800.00. ABU-DAMES described both firearms as "ghost guns" and indicated that they did not have serial numbers. ABU-DAMES also indicated that he would also give UC-2 more Xanax and again encouraged him to find a market for them. UC-2 informed ABU-DAMES that he and a friend would be pooling their money together to purchase these items. UC-2 and ABU-DAMES agreed to meet in person on September 11, 2023, to complete the transaction.

29. On September 11, 2023, the ATF Greensboro Field Office conducted an operation to have UC-2 and an ATF confidential informant (CI), who has been previously used as a CI and found to be reliable, hereinafter referred to as "CI-1", purchase these items from ABU-DAMES. It should be noted that CI-1 has been previously convicted of a crime punishable by a term of

imprisonment exceeding one year. The following is merely a synopsis of the transaction between UC-2 and ABU-DAMES on September 11, 2023. The transaction was recorded with the use of electronic surveillance equipment capable of recording audio and video. These recordings have been retained pending future court proceedings.

30. UC-2 and ABU-DAMES agreed to meet in the parking lot of Harris Teeter located at 4010 Battleground Ave., Greensboro, NC to complete this transaction. Prior to the operation, surveillance units conducted surveillance at ABU-DAMES' residence, 3405 Trail Ridge Dr., Greensboro, NC, which is less than ½ mile away from the Harris Teeter. ABU-DAMES' 2013 Kia Optima bearing registration plate EDX-7576 was observed at the residence.

31. Once surveillance was established on the residence, UC-2 and CI-1 travelled together to the Harris Teeter and parked in the rear of the parking lot. UC-2 notified ABU-DAMES once they arrived. Shortly thereafter, surveillance units observed ABU-DAMES exit his residence and enter the Kia Optima. ABU-DAMES was then surveilled as he traveled directly to the Harris Teeter and parked beside UC-2 and CI-1.

32. UC-2 exited the vehicle and got into the front passenger seat of ABU-DAMES' vehicle. CI-1 remained in his vehicle while the transaction was being conducted. ABU-DAMES retrieved a bookbag from the back seat of his vehicle which contained the two AR-15 pistol variants. UC-2 removed the firearms from the bookbag and determined that one was a PMF bearing no serial number. The second firearm was manufactured with a serialized Anderson Manufacturing lower receiver.

33. ABU-DAMES stated that he had mistakenly left the serialized lower receiver on this firearm and was very concerned that the firearm could be seized and traced back to him. UC-2 informed ABU-DAMES that he would be selling the firearm to Hispanics who would

12

make sure to obliterate the serial number before trafficking it to Mexico. ABU-DAMES asked UC-2 to ensure that the serial number was removed because it was in his name.

34. UC-2 informed ABU-DAMES that one of the firearms would be given to CI-1. UC-2 also told ABU-DAMES that CI-1 was a convicted felon and asked if it was legal for him to possess a PMF. ABU-DAMES stated that it was still illegal for CI-1 to possess a firearm as a convicted felon; however, it would be better if he was caught with the PMF rather than a serialized firearm because the PMF had no identifiable markings.

35. ABU-DAMES then provided UC-2 with a small container which held two (2) 3-D printed drop-in auto sears and a Glock conversion device. It should be noted that UC-2 later learned that one of the components of the conversion device was missing from the container. ABU-DAMES also provided UC-2 with two (2) additional dosage units of suspected Xanax. UC-2 informed ABU-DAMES that CI-1 had a market for the Xanax and encouraged them to talk to each other directly. ABU-DAMES rolled down the window and spoke briefly with CI-1 regarding future drug transactions. ABU-DAMES informed CI-1 that he could get him any type of narcotics that he needed.

36. UC-2 provided ABU-DAMES with $2,800.00 in pre-recorded funds to complete the transaction. UC-2 informed ABU-DAMES that he would sell the firearms and be ready to place another order again soon. As UC-2 exited the vehicle, ABU-DAMES asked him again to ensure that the serial number was removed from the Anderson Manufacturing lower receiver.

13

Case 1:23-cr-00350-LCB    Document 1    Filed 09/28/23    Page 14 of 18

UC-2 and CI-1 left the Harris Teeter parking lot while surveillance units trailed ABU-DAMES directly back to his residence.

37. It should be noted that upon further examination of the Anderson Manufacturing firearm, UC-2 located a third drop-in auto sear that was concealed in the grip of the firearm.

38. Following the transaction on September 11, 2023, ABU-DAMES asked UC-2 to let him know what type of firearms UC-2 needed and he would begin manufacturing them. ABU-DAMES also stated that he currently had a couple privately made pistols that were available for purchase. ABU-DAMES described the PMFs as 9mm clones of the Glock 43 and Glock 19. Through their negotiations, ABU-DAMES agreed to sell UC-2 these two (2) pistols, along with two (2) Glock conversion devices, and approximately fifty (50) dosage units of Xanax for $2,700.00. UC-2 and ABU-DAMES ultimately agreed to meet back at the Harris Teeter parking lot on September 20, 2023, to complete the transaction. ABU-DAMES also agreed to show UC-2 how to install the Glock conversion device on the Glock 19 to convert it into a machinegun.

39. On September 20, 2023, the ATF Greensboro Field Office conducted an operation to have UC-2 and CI-1 purchase the aforementioned items from ABU-DAMES. The following is merely a synopsis of the transaction between UC-2 and ABU-DAMES on September 20, 2023. The transaction was recorded with the use of electronic surveillance equipment capable of recording audio and video. These recordings have been retained pending future court proceedings.

40. Prior to the operation, surveillance was again established at ABU-DAMES' residence. ABU-DAMES vehicle was observed to be parked in front of the residence. UC-2 and

CI-1 traveled back to the Harris Teeter together and parked in the back of the parking lot. Upon arrival, UC-2 informed ABU-DAMES that they had arrived.

41. Several minutes later, surveillance units observed ABU-DAMES leave his residence and travel to the Harris Teeter in his vehicle. ABU-DAMES backed into a parking spot directly beside UC-2. UC-2 got out and entered the front passenger seat of ABU-DAMES' vehicle. CI-1 remained in his vehicle while the transaction was conducted.

42. ABU-DAMES retrieved a shoe box from the back seat which contained the two privately made pistols. ABU-DAMES also removed a pink bubble wrap package from the shoe box which contained the two (2) Glock conversion devices and a plastic sandwich bag containing approximately fifty (50) dosage units of suspected Xanax.

43. UC-2 provided ABU-DAMES with pre-recorded funds to complete the transaction. ABU-DAMES then removed one of the PMFs from the box and showed UC-2 how to install the Glock conversion device. After the installation was complete, ABU-DAMES warned UC-2 that he could face up to twenty years in prison and up to a $250,000.00 fine for being caught with a "switch".

44. During the transaction, UC-2 asked ABU-DAMES about a statement made during a previous conversation in which ABU-DAMES said he had been shot before. ABU-DAMES elaborated on the shooting by stating that he was shot because of his status as one of the biggest drug traffickers in the city of Greensboro. ABU-DAMES stated that some people were not happy about this which resulted in him being targeted and shot six times.

45. UC-2 asked ABU-DAMES about what type of firearm he carried on him. ABU-DAMES reached down beneath the dash and removed a pistol which he described as a "Ruger 57". ABU-DAMES removed the magazine to show UC-2 the rounds which ABU-DAMES

15

described as "mini AR-15" rounds. UC-2 recognized this firearm from training and experience as a Ruger 5.7x28mm pistol.

46. After the transaction was concluded, UC-2 got back into the vehicle with CI-1. ABU-DAMES and CI-1 again spoke briefly about what type of narcotics ABU-DAMES could provide him. ABU-DAMES told UC-2 to give his number to CI-1 so they could deal directly with one another for future drug transactions. UC-2 and CI-1 then left the parking lot while surveillance units trailed ABU-DAMES directly back to his residence.

47. Since these controlled purchases have occurred, UC-2 has continued to communicate with ABU-DAMES regarding future transactions. ABU-DAMES has indicated to UC-2 that he continues to manufacture firearms and machinegun conversion devices utilizing a 3-D printer. ABU-DAMES has offered to sell UC-2 numerous firearms and machinegun conversion devices and indicated that he wants to establish a consistent business relationship. ABU-DAMES has also provided UC-2 with advice on how to market and sell these items in order to maximize profit for both of them.

48. On September 26, 2023, an ATF Firearms Enforcement Officer (FEO) with the Firearms and Ammunition Technology Division, examined the machinegun conversion devices purchased from ABU-DAMES during this investigation. The FEO concluded that each of these devices fell within the definition of a machine gun under Title 26 USC § 5845(b). A technical examination report detailing these findings will be forthcoming.

49. I have consulted with an ATF Industry Operations Investigator (IOI) to have ABU-DAMES queried through the ATF Federal Licensing System to determine if has ever

16

obtained a Federal Firearms License (FFL). I was able to confirm that ABU-DAMES does not possess any license which would allow him to manufacture, deal, or import firearms.

50. In light of the foregoing facts, I respectfully submit that probable cause has been established for the issuance of a Criminal Complaint for violation of Title 18 U.S.C. § 922(a)(1)(a) [Dealing and Manufacturing Firearms without a License] and Title 18 U.S.C. § 922(o) [Unlawful Possession of a Machinegun] by Mahmoud Mazen ABU-DAMES.

Respectfully submitted,

*/s/ Michael B. Newsome*
Special Agent Michael B. Newsome
Bureau of Alcohol, Tobacco, Firearms and Explosives

Pursuant to Rule 4.1 of the Federal Rules of Criminal Procedure, the affiant appeared before me via reliable electronic means (telephone), was placed under oath, and attested to the contents of this written affidavit. This the 28th day of September, 2023 at 8:28 am.

Honorable Joe L. Webster
United States Magistrate Judge
Middle District of North Carolina

17

Case 1:23-cr-00350-LCB   Document 1   Filed 09/28/23   Page 18 of 18